## GORDON H. BALL, INC.,
*Appellant,*

*v.*

## STATE ex rel STATE HIGHWAY DIVISION, et al,
*Respondents.*

### (No. 102183, CA 12435)

604 P2d 891

Daniel H. Skerritt, Portland, argued the cause for appellant. With him on the briefs was Lindsay, Nahstoll, Hart, Neil & Weigler, Portland.

Leslie B. Hampton, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Joseph, Presiding Judge, and Lee and Richardson, Judges.

JOSEPH, P.J.

**JOSEPH, P.J.**

In March, 1973, plaintiff Ball contracted with the Oregon State Highway Division (Division) to widen and resurface parts of Interstate 5. During the term of the contract, the 1973 Arab oil boycott caused sharp increases in the price of petroleum. In special session, the Oregon Legislative Assembly enacted Oregon Laws 1974, chapter 32, which granted authority to state agencies to modify public contracts under certain circumstances to reflect increased costs of petroleum.

Ball filed a claim with the Division for renegotiation under chapter 32. The Oregon Transportation Commission (OTC) denied the claim. Thereafter, Ball filed this declaratory judgment action to set aside OTC's decision and to require the state to negotiate a modification of its contract. The state was granted a summary judgment. This appeal followed.

Ball claims that summary judgment was improperly granted because there remained three questions of fact: 1) whether OTC was the proper agency to determine Ball's claim under chapter 32; 2) whether OTC acted arbitrarily and abused its discretion in denying Ball's claim; and 3) whether the state engineer for the Division had negotiated a settlement with Ball prior to OTC's denial.

Oregon Laws 1974, chapter 32, provides:

"SECTION 1. Section 2 of this Act is added to and made a part of ORS 279.324 to 279.332.

"SECTION 2. (1) Whenever the actual cost to a contractor for procuring any petroleum product required in the performance of a public contract increases by more than 10 percent over the price of the product paid by the contractor on the date the contract was awarded, a state agency at its option may modify the provisions of the public contract to increase the contract price so that the petroleum product cost increase is apportioned between the contracting parties in such manner as they may agree.

"(2)   As used in this section:

"(a)   'Contractor' means any person engaged in the performance of a public contract.

"(b)   'Petroleum product' means crude oil or any refined or unrefined derivative thereof.

"(c)   'State agency' means any elected or appointed officer, board, commission, department, institution, branch or other agency of the state government.

"(3)   When the Legislative Assembly is not in session, a state agency that seeks to modify the contract provisions of a public contract under this section must obtain approval of the Emergency Board for the proposed modification if costs incurred as a result of negotiations concerning modification of contract price will necessitate additional budgetary appropriation for a state agency.

"(4)   This section shall not apply to any public contract awarded after January 15, 1974.

"SECTION 3. This Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this Act takes effect on its passage."[1]

Ball's claim was initially filed with the resident engineer for the Division. He accumulated the data on the various pending petroleum escalation claims and forwarded that data without recommendation to the regional engineer. It was then forwarded to the state highway engineer and referred to Mr. Bond, the Division's construction administration engineer. He prepared a memorandum tabulating four active petroleum escalation claims, including the Ball claim. Mr. Coulter, state highway engineer, reported to OTC on the outstanding petroleum escalation claims and recommended that each of the claimants receive a compromise payment equal to 50 percent of their claims.

OTC considered the claims at its February 15, 1977, meeting. The matter was deferred for one month. At

---

[1] The parties agree that Ball's contract qualifies under the act. It was awarded before January 15, the contract was for petroleum products as defined, and performance of the contract involved increases of more than 10 percent over the price of petroleum products at the date of the contract.

their March 15 meeting the commissioners voted to disallow all of the petroleum escalation claims. Ball asked for reconsideration, and the Commission denied the request.

Ball asserts that the Division—not OTC—was the proper agency to renegotiate its contract because it was the initial contracting party. Ball points out that OTC was not in existence at the time of awarding the contract; it was created approximately three months after the date of the contract by Oregon Laws 1973, chapter 249. That legislation also established the Department of Transportation (DOT). ORS 184.615 (which reflects section 15 of the 1973 law) provides:

"(1)  The Department of Transportation is established.

"(2)  The Department of Transportation shall consist of the Oregon Transportation Commission, the director and deputy director of the department and all personnel employed in the department. The department shall consist of the following administrative divisions:

"(a)  Aeronautics Division.
"(b)  Highway Division.
"(c)  Motor Vehicles Division.
"(d)  Public Transit Division.
"* * * * *."

Section 27 of chapter 249 specifically abolished the Division and transferred to DOT all duties, functions and powers formerly vested in the Division, which then became one of the four divisions of DOT.

OTC, as a part of DOT, has broad powers within the department. ORS 184.617. OTC's authority over the Division is provided for in ORS 366.205:

"(1) The commission shall determine and adopt the general policy relating to the administration of the Highway Division.

"(2) The commission has general supervision and control over all matters pertaining to the selection, establishment, location, construction, improvement, maintenance, operation and administration of state

highways, the letting of contracts therefor, the selection of materials to be used therein and all other matters and things considered necessary or proper by the commission for the accomplishment of the purposes of this Act.

"* * * * *."

Section 88 of the 1973 law concerned the continuity of authority from the Division to DOT and OTC. It states:

"Each agency to which the duties, functions and powers are by this Act assigned and transferred respectively, shall be considered and held to constitute a continuation of the former agency with respect to such powers, functions and duties, and not a new authority, for the purpose of succession to all rights, powers, duties and obligations of the former agency legally incurred under contracts, leases and business transactions, executed, entered into or commenced prior to the operative date of this Act. Each agency to which the duties, functions and powers are by this Act assigned and transferred, respectively, shall exercise such rights, powers, duties and obligations with the same force and effect as if they had not been transferred; but such right, power, duty or obligation shall not be continued beyond the period authorized by law for its existence or beyond the time when it would have terminated if this Act had not been passed."

DOT and OTC thereby were granted the powers, functions, and duties of the former Division. OTC, which has general supervisory powers over the department, was the proper agency to administer the new statutory basis for contract modification.[2] *See State v. McCrea,*

---

[2] Ball asserts that the state engineer in the Division was the "bargained for" officer under the contract and that another officer cannot be substituted in that position. For that proposition Ball relies on *New York Shipbuilding Corp. v. U.S.,* 385 F2d 427 (Ct Cl 1967). That case is wholly dissimilar from the instant case. It involved a contract dispute. Ball's fuel escalation claim is based on a legislative enactment, not on the contract. The contract did not consider or anticipate modification of its terms. OTC by way of legislative reorganization became the body with overall supervision and control over highways and highway contracts and assumed by statute the contract rights and obligations of the Division.

43 Or App 781, 604 P2d 884 (1979).

Ball's second claim is that OTC abused its discretion and acted arbitrarily in denying the petroleum escalation claims.[3] Senate Bill 1009, the source of Oregon Laws 1974, chapter 32, was amended in the Senate Judiciary Committee by inserting "at its option" before the words "may modify" in section 2(1). That showed a clear legislative intent to provide for discretion.[4]

---

[3] There was no claim that this is an APA case. Ball makes no procedural claims.

[4] Ball points out that a New York court, in construing that state's petroleum cost escalation statute, determined that that statute imposed a mandatory obligation to evaluate claims even though that statute used the word "may" rather than "shall." The court's holding was based on legislative intent:

> "*** While the statute does use the word 'may', it is clear that the Legislature intended to enact legislation mandatory in character if the contracting agency of the State, which is considering the adjustment application of the contractor, finds that the conditions precedent specified in the statutes have been met. ***" *John Grace Co. v. State University Construction Fund*, 390 NYS2d 243, 245, 55 AD2d 299 (1976) *rev'd on other grounds*, 404 NYS2d 316, 44 NY2d 84, 37 NE2d 377 (1978).

The legislative history of chapter 32 demonstrates that the Oregon Legislature intended that state agencies have the option to renegotiate or not.

The minutes of the Senate Judiciary Committee hearings on SB 1009 contain the following:

> "MR. KLABOE feels that if this bill passes and they do bring good documentation on escalations, he thinks they are bound to honor that documentation and to increase their price.
>
> "SENATOR HOYT stated that he did not read it that way.
>
> "* * * * *
>
> "MR. KLABOE explained that this legislation would be opening the door to all types of other products that are escalating.
>
> "* * * * *
>
> "SENATOR JOHN BURNS asked to make a statement for the record. When Mr. Klaboe testified on the bill, in response to questions by someone pointing out the fact that the language in the bill was 'permissive', he said that that notwithstanding, if the bill passed the Highway Department would be constrained to mandate this. To be compelled to feel that this mandated that these things be renegotiated. Perhaps he did not mean to say it in the record. The first thing that the

OTC was informed of Mr. Bond's memo and his ▪
tabulation concerning the pros and cons of renegotiat-
ing the claims and was aware of the highway en-
gineer's recommendation. It was also aware that there
would not be severe economic consequences to Ball if
the contract was not renegotiated. We have no basis in
the facts presented on which to conclude that OTC's
collective action in denying the claims was arbitrary.

Ball relies mainly on the remarks of Commissioner ▪
Walsh at the March 15 meeting to show OTC's arbit-
rariness in disallowing the claims. Those remarks
were:

"I see this kind of legislation and maybe my argu-
ment should have been back in 1974 with the Legisla-
ture rather than coming up at this point, I see this
kind of legislation as really interfering with that
kind of natural efficient process and it comes along
and we say okay we got a good smooth working
system here but we are going to tinker with one part
of it. We don't think that the contractor should have
to assume all kinds of risks and we will take on for us
as a public owner certain of those risks. We will take
on the risk of increased petro prices, we might take on
the risk of increased steel prices, we won't take on the
risk of increased cement prices and we will take on
40% of the increased cost of steel. Where do you stop?

---

Court looks to when there is an ambiguity is the minutes of the
Committee to make an effort to find legislative intent. Senator Burns
wished to give Mr. Klaboe an opportunity to correct that.

"* * * * *

"MR. KLABOE stated that if the bill passes, he thinks they are and
have a duty to look at the contractors financial statement when he
brings it in.

"SENATOR JOHN BURNS agreed. But, he felt they were not
under any obligation as a result of the passage of the bill to re-
negotiate.

"MR. KLABOE agreed."

In 1975, the Oregon Legislative Assembly amended Oregon Laws 1974,
chapter 32, section 2, to require a state agency to modify public contracts
under the qualifying circumstances. That legislation was vetoed by the
Governor.

If you are going to take up some of them, I don't know where you stop."

While it may be that Commissioner Walsh did not agree with the legislation, and that attitude may very well have been a factor at least in his voting to disallow the fuel escalation claims, that would not warrant the conclusion that the Commission acted arbitrarily. The legislative history of chapter 32 indicates that there were no statutory limitations placed on the Commission's discretion, and the record does not support plaintiff's generalized accusation of abuse of that discretion.

Ball's third claim is that Mr. Coulter, the state engineer, had made a binding compromise settlement of 50 percent prior to OTC's denial. The record is to the contrary. Mr. Coulter's deposition stands unrefuted that there was no settlement or settlement offer.

Summary judgment was properly granted. Ball's response to the motion did not disclose a material issue of fact. ORS 18.105(4). The only disagreement relates to the conclusions which should be drawn from the manner in which OTC acted in the matter of the escalation claims and the Division's activities prior to the OTC denial. Under such circumstances, it was proper for the case to be determined by a summary judgment for defendants.

Affirmed.